1  Robert V. Prongay (SBN 270796)
       *rprongay@glancylaw.com*
2  Casey E. Sadler (SBN 274241)
       *csadler@glancylaw.com*
3  Pavithra Rajesh (SBN 323055)
       *prajesh@glancylaw.com*
4  GLANCY PRONGAY & MURRAY LLP
   1925 Century Park East, Suite 2100
5  Los Angeles, California 90067
   Telephone: (310) 201-9150
6  Facsimile: (310) 201-9160

7  *Counsel for Lead Plaintiff Brian Jurko*

8  [Additional Counsel on Signature Page]

9                    **UNITED STATES DISTRICT COURT**

10                 **SOUTHERN DISTRICT OF CALIFORNIA**

11

12  VINCENT OSTRANDER, Individually    Case No. 3:24-cv-01034-BAS-MSB
    and on Behalf of All Others Similarly
13  Situated,                          **AMENDED CLASS ACTION
                                        COMPLAINT FOR VIOLATIONS
14             Plaintiff,              OF THE FEDERAL SECURITIES
                                        LAWS**
15             v.

16  TERADATA CORPORATION, et al.,

17             Defendants.

18

19

20

21

22

23

24

25

26

27

28

# **<u>TABLE OF CONTENTS</u>**

I.    NATURE OF THE ACTION AND OVERVIEW ............................................. 1

II.   JURISDICTION AND VENUE ..................................................................... 4

III.  PARTIES ...................................................................................................... 5

IV.   SUBSTANTIVE ALLEGATIONS ................................................................ 6

    A.   Teradata Decides To Pivot Away From Providing On-Premises Services To Providing Cloud-Based Services ....................................................... 6

    B.   The Company Announces It "Remains On Track To Achieve Over One Billion Dollars Of Cloud ARR In 2025" Despite The Undisclosed Risk Of Significant Sales Elongation And Delays ........................................ 8

    C.   After Cautioning That An Eight-Figure Deal Could Be Delayed, Defendants Assured That Teradata Was On Track To Reach Its ARR Targets For The Fiscal Year That Was Ending In A Few Weeks ........ 10

    D.   The Company Finally Discloses That Sales Cycle Elongation Had Significantly Impacted The Company ................................................. 11

    E.   The Company Discloses For The First Time That Certain Large On-Prem Customers Had Informed Teradata Years Ago That They Would Be Taking Its Business Elsewhere ....................................................... 12

    F.   Analysts Were Surprised By Defendants' Admissions Because They Conflicted With Defendants' Prior Representations To The Public .... 14

    G.   Former Employees Confirm That The Company's Executives Were Aware Of The Risk Of Significant Sales Elongation And Delays During The Class Period ............................................................................... 17

V.    MATERIALLY FALSE AND MISLEADING STATEMENTS ISSUED DURING THE CLASS PERIOD .................................................................. 20

    A.   4Q and FY2022 ................................................................................. 20

    B.   1Q2023 .............................................................................................. 22

    C.   2Q2023 .............................................................................................. 24

    D.   3Q2023 .............................................................................................. 25

E.    December 7, 2023 ...................................................................27

VI.    CLASS ACTION ALLEGATIONS................................................28

VII.    LOSS CAUSATION ...................................................................30

VIII.    ADDITIONAL SCIENTER ALLEGATIONS ...............................31

A.    The Individual Defendants Were Actively Involved In The Sales Process Such That They Would Know About Deals Elongating ......................31

B.    The Entire Future Success Of The Company Rested On The Successful Transition From On-Prem To Cloud Services ....................................35

IX.    UNDISCLOSED ADVERSE FACTS ........................................36

X.    APPLICABILITY OF PRESUMPTION OF RELIANCE (FRAUD-ON-THE-MARKET DOCTRINE)...............................................................37

XI.    NO SAFE HARBOR...................................................................39

XII.    CLAIMS ....................................................................................40

XIII.    PRAYER FOR RELIEF..............................................................44

XIV.    JURY TRIAL DEMANDED .......................................................44

Lead Plaintiff Brian Jurko ("Plaintiff"), individually and on behalf of all others similarly situated, by and through his attorneys, alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief is based upon, among other things, his counsel's investigation, which includes without limitation: (a) review and analysis of regulatory filings made by Teradata Corporation ("Teradata" or the "Company") with the United States ("U.S.") Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and media reports issued by and disseminated by Teradata; and (c) review of other publicly available information concerning Teradata.

## I.   NATURE OF THE ACTION AND OVERVIEW

1.   This is a class action on behalf of persons and entities that purchased or otherwise acquired Teradata securities between February 13, 2023 and February 12, 2024, inclusive (the "Class Period"). Plaintiff pursues claims against the Defendants under the Securities Exchange Act of 1934 (the "Exchange Act").

2.   Teradata is an enterprise software company that develops and sells database analytics software. At its inception, Teradata was an on-premises ("on-prem"), enterprise data "warehouse" company that served the information technology ("IT") departments of its customers. (On-prem refers to private data centers housed at the customer's facility.) Teradata then provided data analytic insights using its software for this "on-prem" data and generated revenue primarily from upfront perpetual licenses.

3.   However, as the market shifted towards cloud-based data storage, Teradata developed a cloud solution that was offered through a subscription model with fixed pricing based on actual consumption.  In 2018, the Company introduced Teradata Vantage, the Company's data warehouse platform that allowed companies to leverage all of their data across an enterprise, whether in public or private clouds, on-premises, or in a multi-cloud environment. With this shift, at the end of 2020, the

Company moved to offering subscription based "consumption" pricing. Then, in the third quarter of 2022, the Company introduced its cloud-native product, "VantageCloud Lake", along with "ClearScape Analytics", which the Company touted as having the most "the most in-database analytic functions in the market."

4.    As the Company has repeatedly stated, since the transition in focus to cloud services, its "key priorities" include "migrating existing customers to the cloud" and "expanding our Teradata Vantage multi-cloud data platform product offering." As such, the Company strived to grow revenue through three avenues: 1) migrating current customers from on-prem subscriptions to cloud subscriptions; 2) expanding usage for cloud subscription customers; and 3) acquiring new customers for its cloud solution (called adding "new logos").

5.    With this change in focus, to measure financial performance, Teradata used total annual recurring revenue ("ARR"), which is the "annual value at a point in time of all recurring contracts, including subscription, cloud, software upgrade rights, and maintenance." Total ARR included public, private, and managed cloud implementations. Public Cloud ARR is a subset of total ARR and included only the contracts from public cloud implementations.

6.    On February 13, 2023, Teradata announced that its "Public cloud ARR is expected to increase in the range of 53% to 57% year-over-year" and "Total ARR is expected to increase 6% to 8% year-over-year." At the time the statement was made, the Company was approximately two-and-a-half years into the transition to a cloud-based company.

7.    Unbeknownst to investors, however, two significant on-prem customers had already notified Teradata that they would not transition to the Company's cloud solution. Moreover, the Company had "moved beyond IT" and into more business units of customers. The pervasive nature of the offered services meant that "more executive decision makers, including the Board" of its customers had to approve the deal, and Teradata's prospective deals, especially large deals, took longer to close.

8.      The truth about the elongated deal cycle and its financial impact began to emerge on December 7, 2023, when Teradata's Chief Financial Officer ("CFO") Claire Bramley ("Bramley") revealed that an eight-figure deal was at risk, which would put the Company "towards the low end or slightly below the range for cloud ARR that we previously gave."

9.      On this news, Teradata's stock price fell $2.89, or approximately 6.2%, to close at $43.40 per share on December 7, 2023, on unusually heavy trading volume.

10.     Then, on February 12, 2024, after the markets closed, Teradata announced its fourth quarter and full year 2023 financial results, revealing the Company's public cloud ARR only grew 48% (or 46% in constant currency), which fell short of the Company's previously announced 53-57% expectations. The Company also announced that total ARR grew only 5% in constant currency, falling short of the Company's previously announced 6-8% expectations. In the earnings call following the Company's earnings press release, Steve McMillan ("McMillan"), the Company's President and Chief Executive Officer, stated the Company was seeing "erosion" of its on-prem solutions. Defendants also revealed that Teradata missed ARR expectations due to "timing issues" and that "a handful of large deals that slipped out of December and each were worth $2 million or more of cloud ARR growth."

11.     On this news, Teradata's stock price fell $10.57, or approximately 21.7%, to close at $38.22 per share on February 13, 2024, on unusually heavy trading volume.

12.     Defendants ultimately disclosed that, for nearly three years, they knew that certain large on-prem customers would be leaving the Company. As Defendant Bramley explained, the customers leaving "wasn't a surprise for us. We've been obviously working with those customers trying to win them back over the past couple of years showing them new product introductions." Bramley admitted that it was a

matter of *when* those customers were leaving and stated, "it was anticipated from a kind of a long-range plan standpoint."

13.    Throughout the Class Period, Defendants made materially false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, Defendants failed to disclose that: (1) large on-prem customers had already notified the Company of their intent to leave Teradata for its competitors; (2) deals for its cloud subscription were taking longer to close; and (3) as a result, Teradata was not on track to achieve the ARR growth that it told the market to expect.

## II.    JURISDICTION AND VENUE

14.    The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

15.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

16.    Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)). Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this Judicial District.  Many of the acts charged herein, including the dissemination of materially false and/or misleading information, occurred in substantial part in this Judicial District. In addition, the Company's principal executive offices are located in this District.

17.    In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

### III.    PARTIES

18.    Lead Plaintiff Brian Jurko, as set forth in the certification previously filed with the Court (ECF No. 3-4), incorporated by reference herein, purchased Teradata securities during the Class Period, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

19.    Defendant Teradata is incorporated under the laws of Delaware with its principal executive offices located in San Diego, California. Teradata common stock trade on the New York Stock Exchange under the symbol "TDC."

20.    Defendant McMillan was the Company's President and Chief Executive Officer ("CEO") at all relevant times.

21.    Defendant Bramley was the Company's Chief Financial Officer ("CFO") at all relevant times.

22.    Defendants McMillan and Bramley (collectively the "Individual Defendants"), because of their positions with the Company, possessed the power and authority to control the contents of the Company's reports to the SEC, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, i.e., the market.  The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions and access to material non-public information available to them, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading.  The Individual Defendants are liable for the false statements pleaded herein.

## IV.    SUBSTANTIVE ALLEGATIONS

### A.    Teradata Decides To Pivot Away From Providing On-Premises Services To Providing Cloud-Based Services

23.    Before to the Class Period, Teradata traditionally was an on-premises ("on-prem") only, enterprise data warehouse company. On-prem referred to private data centers housed at a company's own facility. Teradata provided data analytics for data stored on site and generated revenue primarily from upfront perpetual licenses. However, as the market was shifting away from on-prem services towards cloud-based data storage, Teradata began its efforts to enter the cloud-based market and shift to a subscription-based model that allowed for fixed pricing based on actual consumption.

24.    Teradata's planned shift enabled it to emphasize higher margin recurring revenues over lower margin perpetual and consulting revenues upon which it had traditionally relied. McMillan, who became CEO of Teradata in June of 2020, expressed his intention to accelerate Teradata's cloud efforts in his first earnings call as CEO.

25.    McMillan thereafter spearheaded operational and personnel changes at Teradata in the quarters that followed. McMillan increased cloud-focused marketing efforts, prioritized Teradata's cloud platform's capabilities by allocating roughly three quarters of the R&D budget toward cloud improvements and brought on executives to oversee the strategic shift and product changes.

26.    Reflective of this new emphasis, Teradata announced during its fourth quarter 2020 earnings call that it would be disclosing its Public Cloud Annual Recurring Revenue ("ARR") going forward. This disclosure was presented as an act of transparency, providing a key financial metric for measuring progress towards Teradata's cloud-first strategic objectives.

27.    Public Cloud ARR, which is a subset of Total ARR, is defined by Teradata as the annual value at a point in time of all contracts related to public cloud

implementations of Teradata VantageCloud. This metric does not include ARR related to private or managed cloud implementations.

28.    Total ARR, which was another key financial metric for the post-business model pivot, is defined as the annual value at a point in time of all recurring contracts, including subscription, cloud, software upgrade rights, and maintenance. Total ARR does not include revenues from managed services and third-party software.

29.    Teradata indicated that it expected Public Cloud ARR would become a more meaningful part of Total ARR, and that a majority of its revenue would be recurring in 2021.

30.    Teradata's anticipated Public Cloud ARR growth came from three sources: 1) migration of current customers from on-prem to the cloud; 2) customers who already utilized public cloud-based services expanding their usage; and 3) adding "new logos" or new customers in the cloud, particularly among the global 10,00 enterprises.

31.    In September of 2021, Teradata hosted an Investor Day, and Defendants highlighted their progress in implementing the business model shift, advancements with the product, and Teradata's financial performance and outlook.

32.    During the September 2021 Investor Day, McMillan described Teradata's business shift to a cloud-first company as having been largely completed and unveiled a long-term forecast of over $1 billion in cloud ARR by 2025.

33.    Teradata emphasized the importance of reaching $1 billion cloud ARR in 2025 as a point at which the mix of cloud revenue would allow for expanded margins as the Company scaled its business. Specifically, Teradata stated that it expected gross margin on cloud revenue to expand and stabilize in 2025, before expanding and accelerating in 2026 and beyond.

34.    When asked by analysts about the forecasted $1 billion in cloud ARR by 2025, which projected growth faster than the market, Defendants pointed to the

Company's current net expansion rate and its long-term sustainability as a key reason for its confidence that it could outpace the market.

35.    Defendants also presented momentum in adding new logos as well as product and pricing advantages as other factors that would enable the Company to attain its $1 billion cloud ARR goal.

**B.    The Company Announces It "Remains On Track To Achieve Over One Billion Dollars Of Cloud ARR In 2025" Despite The Undisclosed Risk Of Significant Sales Elongation And Delays**

36.    On February 13, 2023, Teradata announced its full fiscal year 2022 financial results and provided the Company's fiscal year 2023 outlook in a press release, which stated in relevant part:[1]

> We are energized to continue our momentum into 2023, accelerating our growth forecasts for ARR, revenue, and earnings per share. ***We remain on-track to achieve over one billion dollars of cloud ARR in 2025*** while driving future margin expansion and free cash flow growth.

37.    On that same day, Teradata held an earnings call during which Defendants explained that the Company's on-prem subscription model was holding steady even though clients were migrating to cloud services. As Defendant McMillan explained:

> [O]ur on-prem subscription business ***remained steady even in light of healthy migrations to the cloud. It's great to see that the team's performance in cloud is fueling overall total ARR growth.***

38.    On the same earnings call, Defendant Bramley acknowledged the reality of longer and more involved sales cycles but downplayed its impact:

> We continue to keep a close eye on the macroeconomic environment and are starting to see increased scrutiny on enterprise spend. ***It is not yet pervasive, but it has influenced our thinking to be prudently conservative in our 2023 outlook.***

39.    Likewise, Defendant Bramley made the following statement denying there were changes in customer behavior despite acknowledging "scrutiny" by customers for deals. She also claimed that the Company and its executives "monitor

---

[1] Unless otherwise stated, all emphasis in bold and italics hereinafter is added.

[deals] closely" and that the effect of this "scrutiny" was "factored . . . into 2023." Specifically, she stated:

> *We are not seeing any significant changes to customer behavior. We are seeing a little bit of scrutiny, but as I mentioned in my prepared remarks, that's not pervasive. So we were very pleased with the team's execution of our Q4 and 2022. We had a strong pipeline, as we mentioned at our last earnings, and the team delivered extremely well on that strong pipeline.* So we are excited about the momentum that we have in 2023 and going into the new year, but we also want to make sure that given the volatility that we are conservative, and we have factored that into 2023. *As a way, we will monitor closely. We've done that throughout 2022, and we will continue to update you and the team and update our models with the latest information.*

40.    On the same call, Defendant Bramley made the following statement about progress toward $1 billion in cloud ARR: "These results demonstrate great progress and momentum in delivering on our strategy we outlined in our 2021 Investor Day."

41.    Multiple analysts issued reports noting that management's ARR expectations were "cautious" and "conservative" because they accounted for the "increased scrutiny in large deals." For example, on February 13, 2023, Morgan Stanley published a report entitled "Hybrid Cloud Story Remains on Track," which said in relevant part:

> *The company is seeing some signs of greater scrutiny with large deals (in some cases taking longer to move through the sales cycle), but it's not (yet) pervasive and not material enough to have a major impact on the business.*
>
> ***
>
> Looking forward, mgmt guided to 2023 Cloud ARR growth of 53-57% Y/Y, which was 5 points below our expectations. *There was nothing in management's commentary or quantification of the net expansion rate (117%) that gives us caution around the Cloud ARR trajectory in 2023, and we believe management is likely being more cautious in their initial guide given the macro environment. Management did mention starting to see signs of increased scrutiny in large deals, which we will be watching closely as the year progresses.*

42.    Similarly, on February 13, 2023, RBC Capital Markets published a report titled "All in on the cloud; Q4/22 review," which stated in relevant part:

On macro, ***management has started to see increasing scrutiny of deals, though not pervasive yet. As such, management noted a prudent approach to CY/23 guidance,*** which calls for public cloud ARR growth of +53-57%, implying deceleration vs. +81% in CY/22 but in-line with consensus at +55%. ***Overall, we feel encouraged by the durability of the business model, improved execution and cloud mix-shift.***

43.     On August 7, 2023, in response to an analyst's question on the Company's earnings call, Defendant Bramley again explained that high scrutiny of deals was not negatively impacting them:

> ***We continue to see that kind of higher level of scrutiny on deals***, but not -- still not seeing deals disappear ***or move away because of the macro***. So that's a good sign moving forward.

**C.     After Cautioning That An Eight-Figure Deal Could Be Delayed, Defendants Assured That Teradata Was On Track To Reach Its ARR Targets For The Fiscal Year That Was Ending In A Few Weeks**

44.     On December 7, 2023, Defendant Bramley spoke at the Barclays Global Technology Conference.  During the conference, Defendant Bramley admitted that one large deal could get pushed out of the Company's 2023 fiscal year. As Defendant Bramley explained:

> I think one of the things that we continue to see is that customers are making a commitment to Teradata, which is great. We have good pipeline, good coverage. ***I think we do continue to see deals potentially elongating in their life cycle. So that's something that definitely we're watching very closely and watching as we move into Q4, which I'm sure we'll come on to shortly.***
>
> ***
>
> ***And actually new information that we've had in the last 24 to 36 hours is that some of -- as I mentioned about elongation of deals, we've got one particular deal that potentially could be pushed out of Q4.***
>
> We always have pluses and minuses. So -- and normally, we have coverage in our guide. At Q3 earnings, I talked about, due to currency impact, we'll be towards the low end of our range. ***I think we've got one, I would say large deal, which is the kind of an 8-figure deal***. So a small ***-- it's kind of the low end of 8 figures, but an 8-figure deal that potentially the timing of that could get pushed out.***

45.     On this news, Teradata's stock price fell $2.89, or approximately 6.2%, to close at $43.40 per share on December 7, 2023, on unusually heavy trading volume.

46.    However, Defendant Bramley claimed that the fiscal 2023 ARR target was still achievable. Specifically, she stated that if the eight-figure deal were pushed out, it "could put [the Company] towards the low end or slightly below the range for cloud ARR that [it] previously gave."

### D.    The Company Finally Discloses That Sales Cycle Elongation Had Significantly Impacted The Company

47.    On February 12, 2024, after the markets closed, the Company announced its fourth quarter and full year 2023 financial results.  Therein, the Company revealed that the Company's public cloud ARR grew only 48%, or 46% in constant currency, which fell well short of the Company's previously announced 53-57% outlook. The Company also announced that total ARR grew 5% in constant currency, falling short of the Company's previously announced 6-8% outlook.  As the press release stated, in relevant part:

Full-Year 2023 Financial Highlights Compared to Full-Year 2022

• *Public cloud ARR increased to $528 million from $357 million, an increase of 48% as reported and 46% in constant currency*[ ]

• *Total ARR increased to $1.570 billion from $1.482 billion, an increase of 6% as reported and 5% in constant currency*[ ]

48.    On the earnings call to discuss the fourth quarter and full year 2023 financial results, Defendant McMillan stated the Company missed ARR expectations due to "timing issues" and "a handful of large deals that slipped out of December and each were worth $2 million or more of cloud ARR growth."  As he explained, in relevant part:

we ended the year below our 2023 outlook for cloud and total ARR. *This was primarily due to deal timing issues*. Let me explain.

We are seeing that Teradata is becoming even more strategic to corporations and touching all levels of our customers' organizations. For example, we have historically dealt primarily with IT. Over time, we have moved beyond IT with multiple business units now relying on Teradata. This brings in more executive decision makers, including the Board, in order to close the deal.

These dynamics cause a number of transactions to move into 2024. Of these, *there was a handful of large deals that slipped out of December*

***and each were worth $2 million or more of cloud ARR growth. This includes the low 8-figure deal Claire mentioned at an investor conference in December.*** We are already taking actions to address the miss in the ARR expectations we had set. We have reviewed the root causes of each slip. Our teams are executing plans to address each unique customer situation and are diligently working to close the majority of these deals in 2024. To be clear, we had uncertainty in timing, not uncertainty in demand.

49.    Defendant Bramley additionally explained that "the 2023 outlook did not fully capture the unexpected deal cycle elongation we saw during the final weeks of the year."

### E.    The Company Discloses For The First Time That Certain Large On-Prem Customers Had Informed Teradata Years Ago That They Would Be Taking Its Business Elsewhere

50.    On the February 12, 2024 earnings call, Defendant McMillan stated the Company was now seeing significant "erosion" for its on-premises solutions that would impact the Company going forward. As he explained, this erosion was due to customer decisions from more than 3 years ago:

We do see, however, some headwinds this year ***as we expect a few large on-prem erosion to negatively impact total ARR in the first half of 2024. They are related to customer decisions that were made more than 3 years ago before we introduced our cloud-first strategy and VantageCloud platform. While we have known that these erosions were contemplated for some time, we've improved our visibility into the timing and are now able to factor these actions into our 2024 outlook***.

\*\*\*

***We have 2 major on-prem erosions that we've known about for some time. In fact, multiple years, before we actually launched our VantageCloud platform, we've known about these intent to erode that on-prem capability.*** Clearly, it doesn't -- that's not impact our cloud ARR, ***but it does impact our total ARR***. And the timing of those erosions in 2024, as we work with the customers to nail down when the timing ends of those erosions, we are able to factor that into the 2024 guidance that we just gave***. So we had also backed [sic – factored in] those erosions because we've known about them for some time, and to our 2025 goals when we set those goals***.

51.    Defendant Bramley confirmed that the risk from these customers was known, material, and being tracked by the Company, yet not disclosed:

***regarding on-prem erosions, we forecast an approximate 4% to 5% negative impact to total ARR in the first quarter of 2024.*** This, in turn, negatively affects recurring revenue, creating a 2 percentage point

impact for the full year. We anticipate an approximate 1% headwind in 2024 related to upfront recurring revenue. This is because the net impact expected at the end of the year is nominal.

\*\*\*

*the overall erosion and the risk of these customers was known, we've been tracking them very closely, so no surprise. The timing is always much more difficult to predict.*

52.    On March 4, 2024, Defendant Bramley spoke at the JMP Securities Technology Conference, where she provided additional color about the loss of large on-prem customers.  According to Bramley, the exit of those customers "wasn't a surprise for us. We've been obviously working with those customers trying to win them back over the past couple of years showing them new product introductions." Bramley claimed that while she knew that they would be leaving – "it was anticipated from a kind of a long-range plan standpoint" – the Company did not know the exact date they would be leaving.  As she explained:

*So an erosion is the fact that their spend with us has reduced. So the total ARR has eroded down. So we talk about erosion. Sometimes it can be a full erosion and the customer leaves us. But quite often, it's kind of -- is a partial erosion. So that's why we talk about erosion.*

So -- and to your point, we have seen over the years, I would say, normal levels of on-prem erosion that we've been able to incorporate into our outlook. We did see an impact in Q1 specifically with regards to a couple of, I would say, large on-prem erosion customers which had been talking about leaving us for a number of years, but have found that very difficult. Decisions made, I think, even before Steve joined Teradata, which was over 3, nearly 3.5 years ago because they were looking for cloud products, cloud-native products at the time, then they were looking for cloud native products. We didn't have that until the beginning of 2023.

And quite often, some customers will say, I don't just want a cloud-native product. I want it to have been GA for 12 months, for example. So there's a couple of customers that did -- are leaving Teradata at the beginning of Q1. *It wasn't a surprise for us. We've been obviously working with those customers trying to win them back over the past couple of years showing them new product introductions*.

*Some customers we've been successful in terms of winning them back, but there is a couple of large customers that are leaving Teradata at the beginning of Q1*. But that's kind of *-- it was anticipated from a kind of a long-range plan standpoint, but wasn't anticipated in terms of the exact timing because it's super difficult to predict because they kind of wait until everything has been set up in the parallel system and then*

*they kind of say, right, we're ready to turn it off.* But so you only -- you don't get necessarily much advanced notice on that.

53.     In fact, on June 12, 2024, at the UBS Women in Tech Summit, Defendant Bramley even admitted she was not surprised those customers left Teradata. As she explained:

So absolutely. So in Q1 of 2024, we did see, I would say, some outsized erosions of a couple of larger enterprises that did move off of Teradata. Now, interestingly, *we've known about that for many years. They've been trying to move off of Teradata to three to four years.*

So clearly, you never want to lose a customer. That's never a good thing. *But the good thing is that we weren't surprised. And we had been trying to work with them to keep them on Teradata.* But reason that they moved is also -- it's not good news, but it's interesting.

**F.     Analysts Were Surprised By Defendants' Admissions Because They Conflicted With Defendants' Prior Representations To The Public**

54.     On February 12, 2024, Guggenheim published an analyst report titled "TDC 4Q23 Recap: Bump in the Road or Bigger Concern Ahead?" The report expressed surprise that there was further slippage, given Bramley's December statements regarding ARR and that large on-premises customers "should have been baked into forecasts":

*We thought 4Q was essentially de-risked*, given CFO Claire Bramley's comments in early December about likely missing the low end of Cloud ARR guide due to a pushed out 8-figure ARR deal, and that 2024 guidance would be in line with consensus. Unfortunately, Cloud ARR growth was even lower than we expected, due to several additional $2M+ ARR migration/expansion deal delays that occurred in the final weeks of 2023. Management said this is due to Teradata now being part of broader strategic cloud decisions, such as choice of CSP and usage across non-IT departments. Most of the deals are expected to close in 2024, although not all.

\*\*\*

Additionally, *there were a few large on-premise customers that will migrate off Teradata in 1Q24 equating to 4-5 pts of growth*, or $60-80M of ARR. Management said these decisions were made years ago, just the ultimate timing was uncertain. As a result, 2024 Total ARR guide for 4-8% is also below Street's +8%, putting in question whether or not this is still an accelerating ARR story. *We can't help but think that this should have already been baked into forecasts.*

55.    Likewise, other analysts explained that the disclosure of the on-prem erosion indicated that there was a corresponding migration risk, which had never been disclosed. For example, a February 13, 2024, Bank of America Global Research published an article titled "Deceleration in F24 raises more questions; Downgrade to neutral," disclosed:

> Secular trajectory comes into question. We are downgrading shares of TDC to Neutral, from Buy, *given (1) weaker trajectory in F24 leading to higher hurdle to achieve F25 goals, (2) on-prem erosion creating risks of future migration pipeline*, (3) marginal improvement in FCF creates increased risk to long-term guidance..

56.    Likewise, a February 13, 2024, SA News report entitled, "Teradata tumbles over 20% after BofA cuts rating following weak outlook," contained the same risk warning to the Company:

> The analysts said the downgraded was due to — weaker trajectory in 2024 leading to higher hurdle to achieve 2025 goals; *on-prem erosion creating risks of future migration pipeline*; marginal improvement in Free cash flow, or FCF, creates increased risk to long-term guidance.

57.    Craig-Hallum Capital Group found it puzzling that that the Company would lower targets during the Class Period because of Russian and foreign exchange issue, yet did not have metrics take into account the on-prem customer risks. As its February 13, 2024 analyst report entitled "Despite Incremental On-Prem Customer Churn There Remains A Path To >$1B Of Cloud ARR And Margin/FCF Expansion In FY'25. Maintaining BUY Rating, Lowering Target Price To $55," explained:

> *We are scratching our heads considering the company lowered FY'25 targets* (effectively 8% ARR/recurring revenue and 4% recurring revenue growth) *on the Q4'22 call primarily due to FX and Russia, being aware of these customer churn events but did not affirm these long-term metrics on the Q4'23 call.*

58.    Similarly, on February 13, 2024, Morgan Stanley published an analyst report entitled "Bumps Along the Transformation Journey; Downgrade to Equal-Weight," in which it stated, in contrast to the Defendants' earlier statements, that "the reality is that the on-prem business is not stabilizing as we had thought." As the article in relevant part stated:

*the slowdown in revenue growth is a direct reflection of declines in TDC's on-premise business, a key crux of the bear thesis.* For 2024, management guided revenue growth of 0-2% Y/Y at CC, a deceleration from 4% Y/Y growth in 2023. *This deceleration is largely being driven by the Non-Cloud ARR business, which we forecast declining* 10% Y/Y at CC in 2024 (vs. -10% Y/Y in 2022 and -5% Y/Y in 2023, both at CC). While we understand that excluding cloud migrations, on-prem subscription is expected to grow low-single digits Y/Y, *the reality is that the on-prem business is not stabilizing as we had thought.* For example, while the two on-premise deal erosions that management discussed on last night's call might be the product of decisions made years ago, they are still, partially, a product of competitive losses (i.e. a TDC customer moving off TDC's on-prem solution to a competitor offering). And while TDC's cloud new logos pipeline is growing, new logos are still small today, which means that any larger-than-expected customer churn away from the TDC on-premise platform (like we're getting in 2024) likely won't be materially offset by new customers coming onto the platform, *perpetuating bear concerns about the stability of TDC's on-premise business.*

59.    On February 13, 2024, Barclays published a report titled "Many Moving Parts Around ARR Miss and Guidance," which included the following statement:

TDC noted at the Barclays TMT Conference it had an 8-figure cloud deal that could potentially slip out of December, which was expected to cause it to deliver towards the low-end to slightly below its 53-57% y/y Public Cloud growth target (see Global Technology Conference Day 2 Takeaways, 12/8/23). However, Q4 saw a handful of other cloud deals worth $2mn or more slip out of December that led to the ~48% y/y Public Cloud growth delivered (46% in cc), *which likely came below even the more conservative investor expectations.*

60.    On February 13, 2024, TD Cowen published an analyst report entitled "Weak 4Q; Deal Slippage Drives Cloud Miss, Challenges Ahead in FY24," that was similarly "surprised" by the "on-premise erosion" that "could reignite concerns on the competitive landscape":

*The other big surprise was the "on-premise erosion" taking place by a few large customers,* expected to lead to a ~$60-80m Q/Q headwind to ARR in 1Q (4-5% impact to growth). Mgmt indicated they had expected this to happen in '25, but it took place earlier than thought. *In our view, this could reignite concerns on the competitive landscape,* noting that we recently flagged press indicating that National Australia Bank was migrating a large TDC system to Databricks.

**G.    Former Employees Confirm That The Company's Executives Were Aware Of The Risk Of Significant Sales Elongation And Delays During The Class Period**

61.    Former Teradata employees confirm that Defendants were aware of the sales elongation issue during the Class Period.  For example, CW1,[2] a Sales Operations Executive recounted that it was common for deals to slip at Teradata. According to CW1, deals often slipped because clients believed Teradata's "road map" - its timeline to have a feature up and running - was unrealistic.  CW1 recalled that while a lot of customers were buying short term extensions that would allow them time to make decisions, "we were in a constant battle to try and win them back." In fact, CW1 stated that Teradata "had a lot of erosion" during the Class Period.

62.    According to CW2,[3] deals slipped because of Teradata's refusal to invest in its infrastructure which prohibited Teradata from offering the types of features that Teradata's competitors offered, including access to the cloud. Likewise, CW2 also stated that many deals did not close on their projected close dates because Teradata refused to implement features at the request of customers or provide a "road map" to the customer committing to having these features in place by a certain date. Specifically, there were problems with Teradata's technology, including outages, which frequently occurred and prohibited customers from accessing their data, and customers demanded firm commitments from Teradata to fix bugs or implement new technology, such as cloud computing, before they sign new contracts. CW2 explained that customers demanded bugs be fixed and conditioned their willingness to continue to do business with Teradata upon Teradata's commitment to provide the customer a

---

[2] CW1 was employed as a Sales Operations Executive at the Company from September 2021 through January 2024 and reported to Jason Ricks, Director of Sales Operations.

[3] CW2 was employed as a Senior Director, Microsoft Global from August 2021 through November 2023, and reported to Lisa Stewart, Senior Vice President, Worldwide Partners and Alliances.

"roadmap," timelines, "proofs of concept" and pilots, and that preparing "roadmaps" for costumers was standard in the industry.

63.    CW3[4], a Senior Enterprise Account Executive during the Class Period, further explained that deals at Teradata often failed to close because features did not (or could not) work with potential customers' technological environments and that this well known, company-wide problem which frequently caused deals to slip. According to CW3, in essence, Teradata was trying to sell a product that was not ready. In fact, during a September 2023 effort to close a deal with Cable One, Teradata ran a "mock" performance of its software for Cable One employees because its actual software did not work. In other words, "[y]ou're showing mock examples of the software working when it really didn't." The software parts that did not function included features on getting models to run for AI, analytics services, as well as the software's failure to interact properly with Google. Nonetheless, Teradata instructed its salespeople to sell the software as if it did work.

64.    The former employees also all confirm that Teradata's executives were aware of the deals and the risks to them closing in real time. CW1 explained that sales teams at Teradata met weekly via Microsoft Teams to discuss and review deal forecast reports generated through SalesForce and new deals were tracked using the sales MEDDPICC methodology. Moreover, for large deals, CW1 stated that sales teams would meet at least weekly - if not daily - to discuss the risks of these deals not closing and that identified risks were communicated to Defendants McMillan and Bramley.

65.    CW2 also confirmed that Company executives were aware of deal slippage. According to CW2, CW2 participated in calls with Teradata's Chief Revenue Officer, Todd Cione ("Cione"), and sales teams during which problems were communicated to Cione who was told that such problems would keep deals from

---

[4] CW3 was employed as a Senior Enterprise Account Executive from August 2021 through June 2023.

closing by the projected dates shown in SalesForce, including deals with Macy's, AT&T and Walmart. CW2 further stated that, at Cione's behest, closing dates for deals were arbitrarily adjusted in SalesForce to reflect timelines the sales teams believed were unrealistic. Additionally, CW2 explained that deal tracking information, including likely close dates, was provided to the C-suite through a series of calls. These calls started with "micro-level" sales teams call every Monday, during which the viability of deals was discussed. Deals that appeared realistic were put into SalesForce and scheduled to be considered on a second "pipeline" call that occurred bi-monthly. CW2 explained that on the "pipeline" call, which included an entire sales region's staff, their leadership, and Teradata's Chief Technology Officer, sales teams would articulate what specifics customers required before they would close deals and from that extrapolate a projected close date. After the "pipeline" calls, CW2 explained that there would be "forecasting" calls, which typically included Cione and Teradata's Chief Marketing Officer, Jacqueline Woods. During the "forecasting" calls, the sales staff provided Teradata executives strong pushback on overly optimistic closing dates. According to CW2, however, Cione pressured sales staff to alter closing dates in SalesForce to make it appear that these deals would close sooner than the sales staff believed possible.

66.    CW3, a Senior Enterprise Account Executive during the Class Period, also confirmed that information had to be entered into SalesForce so that SalesForce could monitor these deals and use this information to track when deals were expected to close. According to CW3, the C-suite monitored this information daily. According to CW3, "I knew [this] because the C-level would have meetings with the SVPs, the SVPs would have meetings with the directors, and they would have meetings with us to express concerns they have with some of the numbers."

## V.  MATERIALLY FALSE AND MISLEADING STATEMENTS ISSUED DURING THE CLASS PERIOD

### A.    4Q and FY2022

67.    The Class Period begins on February 13, 2023. On that date, the Company announced its full fiscal year 2022 financial results and provided the Company's fiscal year 2023 outlook in a press release which stated in relevant part:

> We are energized to continue our momentum into 2023, accelerating our growth forecasts for ARR, revenue, and earnings per share. ***We remain on-track to achieve over one billion dollars of cloud ARR in 2025*** while driving future margin expansion and free cash flow growth.

68.    On that same day, Defendants held an earnings call with analysts to discuss the financial results. Therein, Defendant Bramley made the following statement downplaying the impact of longer deal cycles:

> We continue to keep a close eye on the macroeconomic environment and are starting to see increased scrutiny on enterprise spend. ***It is not yet pervasive, but it has influenced our thinking to be prudently conservative in our 2023 outlook.***

69.    Similarly, in response to analysts' question, Defendant Bramley made the following statements denying changes in customer behavior despite acknowledging higher scrutiny:

> ***We are not seeing any significant changes to customer behavior. We are seeing a little bit of scrutiny, but as I mentioned in my prepared remarks, that's not pervasive. So we were very pleased with the team's execution of our Q4 and 2022. We had a strong pipeline, as we mentioned at our last earnings, and the team delivered extremely well on that strong pipeline.*** So we are excited about the momentum that we have in 2023 and going into the new year, but we also want to make sure that given the volatility that we are conservative, and we have factored that into 2023. ***As a way, we will monitor closely. We've done that throughout 2022, and we will continue to update you and the team and update our models with the latest information.***
>
> ***
>
> I did mention a little bit of additional scrutiny. ***As I mentioned, it's not pervasive. No significant changes to customer behavior***, but we just thought that was important to ***take into consideration and derisk our 2023 outlook***.

70.    The above statements were materially false and/or misleading and failed to disclose material adverse facts about the Company's business, operations, and

prospects. Specifically, Defendants failed to disclose to investors that (1) deals for its cloud subscription were taking longer to close and (2) as a result, Teradata was not on track to achieve the ARR growth that it told the market to expect.

71.     Additionally, during the same earnings call, Defendant McMillan confirmed that Teradata's on-prem business remained steady:

> [O]ur on-prem subscription business *remained steady even in light of healthy migrations to the cloud. It's great to see that the team's performance in cloud is fueling overall total ARR growth.*

72.     Likewise, later in the same call in response to an analyst's question, Defendant McMillan reiterated that its on-prem business remained steady:

> From a renewals perspective, *the team landed a great quarter from a renewals and expansion of our on-prem business.* As we said and as Claire said in her prepared remarks, *our on-prem ARR stayed very steady.*

73.     The above statements were materially false and/or misleading and failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, Defendants failed to disclose to investors that large on-prem customers had informed Defendants of their intent to leave Teradata for its competitors.

74.     On February 24, 2023, the Company submitted its annual report for fiscal year 2022 ended December 31, 2022 on a Form 10-K filed with the SEC which reported the following:

> For the full year 2023, Public Cloud ARR is expected to increase in the range of 53% to 57% year-over-year. Total ARR is expected to increase in the range of 6% to 8% year-over-year.

75.     The above statements were materially false and/or misleading and failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, Defendants failed to disclose to investors that (1) deals for its cloud subscription were taking longer to close and (2) as a result, Teradata was not on track to achieve the ARR growth that it told the market to expect.

76.    On March 7, 2023, Defendant McMillan spoke at the Morgan Stanley Technology, Media & Telecom Conference. Therein, McMillan explained that the Company's was on track to achieve the ARR growth that it told the market to expect:

So in 2023, the reason we have confidence in terms of our 2023 guidance is *because a lot of our cloud growth is actually going to be funded from that migration from on-prem to the cloud. And we have that tight integration with our customers so that we know what their plans are for that workload and how they plan to move that spend from on-prem to a cloud environment*. So a lot of our business in 2023 is going to be driven by migration

\*\*\*

*And the reason that we felt confident in terms of recommitting to those metrics for 2025 is because our 2023 guidance set a glide path essentially to achieving that 2025 number* in terms of having over a $1 billion of cloud ARR.

\*\*\*

And the fact that we can set these guides in terms of what we plan to do from a shareholder return perspective. *And that confidence really is based on the confidence that we have in the topline because of the commitments, the contractual commitments that we have for our customers, the lack of dependence on a consumption model.*

77.    The above statements were materially false and/or misleading and failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, Defendants failed to disclose to investors that: (1) large on-prem customers had informed Defendants of their intent to leave Teradata for its competitors; (2) deals for its cloud subscription were taking longer to close; and (3) as a result, Teradata was not on track to achieve the ARR growth that it told the market to expect.

**B.    1Q2023**

78.    On May 4, 2023, the Company announced its first fiscal quarter 2023 financial results in a press release, which stated in relevant part:

Teradata is off to a strong start in 2023 with sequential growth in total ARR, and we closed one of the largest deals in Teradata's history…tangible proof points of our cloud-first strategy in action," said Steve McMillan, President and CEO, Teradata. "Customers are expanding their cloud environments, underscoring the power of the Teradata platform, and driving demand for our differentiated analytics.

*We are excited for the year ahead and are on track to achieve all elements of our annual outlook.*

\*\*\*

For the full year 2023, Teradata re-affirms the following outlook elements:

• *Public cloud ARR is expected to increase in the range of 53% to 57% year-over-year*

• *Total ARR is expected to increase in the range of 6% to 8% year-over-year*

79.    On that same day, the Company and its executives held an earnings call with analysts.  Therein, Defendant McMillan reiterated that the Company's was on track to achieve the ARR growth that it told the market to expect:

Our Q1 performance gives us significant confidence in the year ahead. We are committed to our outlook for 2023, and *we remain on track to achieve our fiscal 2025 target of more than $1 billion in cloud ARR.*

80.    Likewise, Defendant Bramley also confirmed that the Company was "not currently see[ing] any other material headwinds impacting our business."

81.    The above statements were materially false and/or misleading, and failed to disclose material adverse facts about the Company's business, operations, and prospects.  Specifically, Defendants failed to disclose to investors that: (1) large on-prem customers had informed Defendants of their intent to leave Teradata for its competitors; (2) deals for its cloud subscription were taking longer to close; and (3) as a result, Teradata was not on track to achieve the ARR growth that it told the market to expect.

82.    On May 5, 2023, the Company submitted its quarterly report for the fiscal quarter ended March 31, 2023 on a Form 10-Q filed with the SEC, which stated in relevant part:

Teradata re-affirms the following outlook for the full year 2023:

•Public cloud ARR is expected to increase in the range of 53% to 57% year-over-year.

•Total ARR is expected to increase in the range of 6% to 8% year-over-year.

83.    The above statements were materially false and/or misleading and failed to disclose material adverse facts about the Company's business, operations, and prospects.  Specifically, Defendants failed to disclose to investors that (1) deals for its cloud subscription were taking longer to close and (2) as a result, Teradata was not on track to achieve the ARR growth that it told the market to expect.

## C.    2Q2023

84.    On August 7, 2023, the Company announced its second fiscal quarter 2023 financial results in a press release, which stated in relevant part:

> For the full year 2023, Teradata re-affirms the following outlook elements:
>
> • **Public cloud ARR is expected to increase in the range of 53% to 57% year-over-year**
>
> • **Total ARR is expected to increase in the range of 6% to 8% year-over-year**

85.    On that same day, the Company held an earnings call with analysts. Therein, in response to an analyst's question, Defendant Bramley affirmed that the Company was on track to achieve the ARR growth that it told the market to expect:

> *Just want to reiterate, we have full confidence in our full year numbers. So high confidence in the outlook that we've given for the full year.*
>
> ***
>
> So I think based on the pipeline that we're seeing, *we've got very good coverage as we look forward, which gives us high confidence in our full year outlook*. We do need to do more in dollars to operate on cloud ARR, but that's normal seasonality in the second half and particularly in Q4. *So as we look at our pipeline and to your point of deals that we're working through right now, we have very high confidence in being able to meet the full year outlook that we've given.*

86.    On August 7, 2023, in response to an analyst's question on the Company's earnings call, Defendant Bramley again explained that high scrutiny of deals was not negatively impacting them:

> *We continue to see that kind of higher level of scrutiny on deals*, but not -- still not seeing deals disappear *or move away because of the macro*. So that's a good sign moving forward.

87.    On August 8, 2023, the Company submitted its quarterly report for the fiscal quarter ended June 30, 2023 on a Form 10-Q filed with the SEC, which stated in relevant part:

Teradata re-affirms the following outlook for the full year 2023:

•*Public cloud ARR is expected to increase in the range of 53% to 57% year-over-year.*

•*Total ARR is expected to increase in the range of 6% to 8% year-over-year.*

88.    The above statements were materially false and/or misleading, and failed to disclose material adverse facts about the Company's business, operations, and prospects.  Specifically, Defendants failed to disclose to investors that (1) deals for its cloud subscription were taking longer to close and (2) as a result, Teradata was not on track to achieve the ARR growth that it told the market to expect.

**D.    3Q2023**

89.    On November 6, 2023, the Company announced its fiscal third quarter 2023 financial results in a press release, which stated in relevant part:

For the full year 2023, Teradata re-affirms the following outlook elements:

• *Public cloud ARR growth of 53% to 57% year-over-year*

• *Total ARR growth of 6% to 8% year-over-year*

90.    On that same day, the Company held an earnings call with analysts. Therein, Defendant Bramley reiterated that the Company was on track to achieve the ARR growth that it told the market to expect:

We have sustained and increased our cloud momentum as a result of greater market awareness and customer demand. Migrations and expansions have equally contributed to the reported $40 million of sequential cloud ARR growth, slightly ahead of our expectations, resulting in an increase of 63% year-over-year.

***

As we enter our seasonally strongest quarter, *we remain on track to achieve the outlook ranges we previously provided for 2023.* This is despite incremental unplanned currency headwinds we now anticipate in the fourth quarter. I will cover more on our annual outlook shortly. *We*

---

*remain steadfast on executing against our cloud-first profitable growth strategy with the goal of continuously increasing shareholder value.*

\*\*\*

We know that our fourth quarter is seasonally our highest sales quarter. Given our progress to date in the quarter and the current pipeline*, we are confident that total and cloud ARR dollar growth will increase sequentially and will be within our annual outlook ranges.*

\*\*\*

Despite these unplanned currency headwinds, our forecast indicates we will land within our 2023 outlook ranges for ARR, revenue and free cash flow.

\*\*\*

In summary, we are on track to achieve our 2023 outlook*. Beyond 2023, we continue to remain on track and confident on the path to achieve our financial goals for 2025.*

91.     Similarly, in response to a question from an analyst, Defendant Bramley further explained, "we do have good confidence in the goals that we previously laid out."

92.     On the same call, Defendant McMillian likewise reiterated that the Company was on track to achieve the ARR growth that it told the market to expect:

As you can imagine*, the migrations tend to be larger deals within the pipeline and we've got a number of 7-figure and 8-figure deals in the Q4 pipeline. And we do have good visibility and visibility over time into those deals.* What we do when we construct those deals for our customers is make it commercially compelling. So that, that migration to the cloud, even though at that point of migration, they usually expand their overall business with Teradata, it's actually a commercially compelling value proposition to move to the cloud. *So we've got great insight into that. We're confident in the guidance that we've given for Q4 and confident in the continued execution of the team.*

93.     The above statements were materially false and/or misleading, and failed to disclose material adverse facts about the Company's business, operations, and prospects.  Specifically, Defendants failed to disclose to investors that (1) deals for its cloud subscription were taking longer to close and (2) as a result, Teradata was not on track to achieve the ARR growth that it told the market to expect.

94.    On November 7, 2023, the Company submitted its quarterly report for the fiscal quarter ended September 30, 2023 on a Form 10-Q filed with the SEC, which stated in relevant part:

> Teradata re-affirms the following outlook for the full year 2023:
>
> **•Public cloud ARR is expected to increase in the range of 53% to 57% year-over-year.**
>
> **•Total ARR is expected to increase in the range of 6% to 8% year-over-year.**

95.    The above statements were materially false and/or misleading, and failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, Defendants failed to disclose to investors that (1) deals for its cloud subscription were taking longer to close and (2) as a result, Teradata was not on track to achieve the ARR growth that it told the market to expect.

**E.    December 7, 2023**

96.    On December 7, 2023, Defendant Bramley spoke at the Barclays Global Technology Conference. Therein, Defendant Bramley admitted that one large deal could get pushed out of the Company's 2023 fiscal year and that this "could put [the Company] towards the low end or slightly below the range for cloud ARR that [it] previously gave." As Defendant Bramley explained:

> I think one of the things that we continue to see is that customers are making a commitment to Teradata, which is great. We have good pipeline, good coverage. **I think we do continue to see deals potentially elongating in their life cycle. So that's something that definitely we're watching very closely and watching as we move into Q4, which I'm sure we'll come on to shortly.**
>
> ***
>
> **And actually new information that we've had in the last 24 to 36 hours is that some of -- as I mentioned about elongation of deals, we've got one particular deal that potentially could be pushed out of Q4.**
>
> We always have pluses and minuses. So -- and normally, we have coverage in our guide. At Q3 earnings, I talked about, due to currency impact, we'll be towards the low end of our range. **I think we've got one, I would say large deal, which is the kind of an 8-figure deal. So a small -- it's kind of the low end of 8 figures, but an 8-figure deal that potentially the timing of that could get pushed out.**

And it's mainly, again, not competitive pressure, not issues. We expect to close it. But they at the customer have -- are seeing corporate development action-type activity. And so from a timing standpoint, they're just looking for new timing. So that, *I'll be honest, that could put us towards the low end or slightly below the range for cloud ARR that we previously gave.*

***

*as I said, we do have a good pipeline and a good range of deals. But if the deals are smaller, it's much easier to cover. Some move in, some move out, it's very easy to cover.*

If you get a couple of these very large deals, to your point, 8-figure deals, it's a very large deal. *And at this point, getting this information at this point in the quarter, it's not -- there's not much time to be able to cover it, unfortunately.* But as it's timing, it pushes to '24, which from that standpoint, is good.

97.     The above statements were materially false and/or misleading, and failed to disclose material adverse facts about the Company's business, operations, and prospects.  Specifically, Defendants failed to disclose to investors that (1) deals for its cloud subscription were taking longer to close and (2) as a result, Teradata was not on track to achieve the ARR growth that it told the market to expect.

## VI.    CLASS ACTION ALLEGATIONS

98.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class, consisting of all persons and entities that purchased or otherwise acquired Teradata securities between February 13, 2023 and February 12, 2024, inclusive, and who were damaged thereby (the "Class").  Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

99.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Teradata's shares actively traded on the New York Stock Exchange.  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate

1 discovery, Plaintiff believes that there are at least hundreds or thousands of members
2 in the proposed Class.  Millions of Teradata shares were traded publicly during the
3 Class Period on the New York Stock Exchange.  Record owners and other members
4 of the Class may be identified from records maintained by Teradata or its transfer
5 agent and may be notified of the pendency of this action by mail, using the form of
6 notice similar to that customarily used in securities class actions.

7    100.  Plaintiff's claims are typical of the claims of the members of the Class
8 as all members of the Class are similarly affected by Defendants' wrongful conduct
9 in violation of federal law that is complained of herein.

10    101.  Plaintiff will fairly and adequately protect the interests of the members
11 of the Class and has retained counsel competent and experienced in class and
12 securities litigation.

13    102.  Common questions of law and fact exist as to all members of the Class
14 and predominate over any questions solely affecting individual members of the Class.
15 Among the questions of law and fact common to the Class are:

16        (a)    whether the federal securities laws were violated by Defendants'
17 acts as alleged herein;

18        (b)    whether statements made by Defendants to the investing public
19 during the Class Period omitted and/or misrepresented material facts about the
20 business, operations, and prospects of Teradata; and

21        (c)    to what extent the members of the Class have sustained damages
22 and the proper measure of damages.

23    103.  A class action is superior to all other available methods for the fair and
24 efficient adjudication of this controversy since joinder of all members is
25 impracticable.  Furthermore, as the damages suffered by individual Class members
26 may be relatively small, the expense and burden of individual litigation makes it
27 impossible for members of the Class to individually redress the wrongs done to them.
28 There will be no difficulty in the management of this action as a class action.

## VII.    LOSS CAUSATION

104.    Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiff and the Class. Defendants' misrepresentations and omissions caused and maintained the artificial inflation in Teradata's stock price throughout the Class Period until the truth was partially and/or fully disclosed.

105.    On December 7, 2023, Defendant Bramley revealed that one large deal could get pushed out of the Company's 2023 fiscal year and that this "could put [the Company] towards the low end or slightly below the range for cloud ARR that [it] previously gave."

106.    On this news, Teradata's stock price fell $2.89, or approximately 6.2%, to close at $43.40 per share on December 7, 2023, on unusually heavy trading volume.

107.    On February 12, 2024, after the markets closed, Teradata announced its fourth quarter and full year 2023 financial results, revealing the Company's public cloud ARR and total ARR only grew 48% (or 46% in constant currency) and 5% in constant currency, respectively, falling short of their previously announced expectations.  Defendant McMillan also admitted that same day on an earning call that the Company was seeing "erosion" for its on-premises ("on-prem") solutions and missed ARR expectations due to "timing issues" and "a handful of large deals that slipped out of December and each were worth $2 million or more of cloud ARR growth."

108.    On this news, Teradata's stock price fell $10.57, or approximately 21.7%, to close at $38.22 per share on February 13, 2024, on unusually heavy trading volume.

109.    During the Class Period, Plaintiff and the Class purchased Teradata's securities at artificially inflated prices and were damaged thereby.  The price of the Company's securities significantly declined when the misrepresentations made to the

market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, causing investors' losses.

## VIII. ADDITIONAL SCIENTER ALLEGATIONS

110.   As alleged herein, Defendants acted with scienter since Defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and/or misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.  As set forth elsewhere herein in detail, the Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding Teradata, their control over, and/or receipt and/or modification of Teradata's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Teradata, participated in the fraudulent scheme alleged herein.

### A.   The Individual Defendants Were Actively Involved In The Sales Process Such That They Would Know About Deals Elongating

111.   As the former employees recalled, the Individual Defendants and other executives were actively involved in the sales process and knew about the risks to major deals.  This is further supported by the Individual Defendants' own admissions that they monitored all deals.  For example, at the start of the Class Period (February 13, 2023), in an earnings call, Defendant Bramley admitted that the Company's executives "monitor[ed] closely" its customers behavior and sales pipeline:

> *We are not seeing any significant changes to customer behavior. We are seeing a little bit of scrutiny, but as I mentioned in my prepared remarks, that's not pervasive. So we were very pleased with the team's execution of our Q4 and 2022. We had a strong pipeline, as we mentioned at our last earnings, and the team delivered extremely well on that strong pipeline.* So we are excited about the momentum that we have in 2023 and going into the new year, but we also want to make sure that given the volatility that we are conservative, and we have factored that into 2023. *As a way, we will monitor closely. We've done that*

*throughout 2022, and we will continue to update you and the team and update our models with the latest information.*

112.   In fact, analysts touted that they were confident in the Company's ARR guidance specifically because Bramley said "her team know the migration status of every single Teradata customer."   As the April 30, 2023, analyst report issued by Guggenheim entitled, "TDC: The Incumbent Shows Its Teeth; Upgrading to Buy with $62 Price Target," explained:

> Reconciling Teradata's customer retention with Snowflake's commentary. ***There's been a long held belief in the data and analytics world that a significant percentage of Teradata's customer base is either in the process of migrating to Snowflake or a hyperscaler, or will.*** For instance, at a sell-side investor conference in March 2023, Snowflake's CFO Mike Scarpelli said that Snowflake had "signed over 1,500 on-premise data warehouse migrations of principally Teradata, while less than 100 of those have customers have actually Teradata down." This implies that Teradata is destined to have its lunch eaten gradually over time. We asked Teradata's CFO Claire Bramley during our virtual investor meetings on March 16th. ***Ms. Bramley said this simply was not possible, given that she and her team know the migration status of every single Teradata customer.***

***

***More confidence in 2023 ARR guidance.***

113.   Similarly, Defendant Bramley confirmed that the Company "track[s] very closely every single deal through the entire pipeline" at the June 7, 2023, Bank of America Global Technology Conference.  As she explained in relevant part:

> So interestingly, ***we're not losing customers.*** So to your point, ***we track very closely every single deal through the entire pipeline.*** And the interesting thing is we're not losing deals***. But some of the deal cycles can be elongated in some cases. *And* -- *but we haven't seen any major impact so far from the macro.***

> ***Definitely more scrutiny. I mean, definitely more scrutiny, more levels of approval, et cetera. But we picked up on that very early actually***. And the sales ***team have got very good in the last year or so of being able to ensure that we truly understand what is the cycle that it needs to go through***. Do we understand who are all of the people that need to approve this deal. And if it doesn't need CFO, CEO approval, ***kind of just double checking because quite often big cloud deals do these days.***

> So we've become, ***I think, much more informed, much more proactive in terms of understanding that so that when we're doing our own forecasting, we can be a lot more predictable***. But it's still lumpy. I mean, they're big deals***.*** A deal can move from one week to the next, one

month to the next very easily. Just need some -- an important signature to be on vacation and suddenly, it takes -- there's an extra week added sort of thing. But I mean, our deal cycles tend to be on the longer side. **But interestingly from a macro standpoint, we're just seeing a little bit more scrutiny, additional approvals and things like that, but not a significant impact but we're watching it very closely.**

114.    Likewise, on November 6, 2023, in response to a question from an analyst, Defendant McMillan explained that "we have [a] very good line of sight into execution for Q4, and pipeline of deals that supports that 2023 outlook":

…And to your point, **we have very good line of sight into execution for Q4, and a pipeline of deals that supports that 2023 outlook, driven by both migrations and expansions.**

As you can imagine**, the migrations tend to be larger deals within the pipeline and we've got a number of 7-figure and 8-figure deals in the Q4 pipeline. And we do have good visibility and visibility over time into those deals.** What we do when we construct those deals for our customers is make it commercially compelling. So that, that migration to the cloud, even though at that point of migration, they usually expand their overall business with Teradata, it's actually a commercially compelling value proposition to move to the cloud. **So we've got great insight into that. We're confident in the guidance that we've given for Q4 and confident in the continued execution of the team.**

115.    Thereafter, on December 7, 2023, Defendant Bramley spoke at the Barclays Global Technology Conference where she explained that the Company's executives watch potential deals "very closely":

I think one of the things that we continue to see is that customers are making a commitment to Teradata, which is great. We have good pipeline, good coverage. **I think we do continue to see deals potentially elongating in their life cycle. So that's something that definitely we're watching very closely and watching as we move into Q4, which I'm sure we'll come on to shortly.**

116.    Then at the end of the Class Period, on the February 12, 2024 earnings call, Defendant McMillan admitted that the Company and its executives were intimately familiar with each of the deals at issue. In response to a question regarding how the Company only thought it was one deal slipping in early December, yet it was many just weeks later multiple slippage were announced, Defendant McMillan responded in relevant part:

WOODRING: **like it's not new that you're engaging with multiple decision-makers at different customers or prospective customers. And**

*you haven't really seen deals slippage to date that I can recall you calling out*. So I guess the question is just why now? *1st of December, it was just one large figure deal related to something company-specific, but it expanded beyond that*. So what makes you think that this is purely isolated to this quarter and not something broader? And that's it for me.

MCMILLAN: I think we're just continuing to see great interest in the platform and the opportunities that we had in play. *We understand the root causes against every single one of those opportunities*. We know whether it may have been an uncertainty on which CSP that they wanted to use or which capabilities that they wanted to use or the different business units that are involved in those decisions. *So we think we've got a good handle on those particular deals at those handful of deals that were over $2 million in terms of how they're going to close out in 2024*.

117.  In fact, after the Class Period, on May 6, 2024, Defendant McMillan admitted during an earnings call that the Company "ha[s] a very detailed understanding" of their customers:

As we look at the erosions for full year, we don't see any changes to our outlook today versus 90 days ago, and that is all factored into our outlook for the year. As we take a step back, we absolutely run the most complex and mission-critical workloads for the world's largest enterprises. *And we do have a very detailed understanding of what's going on inside those customers*. We created a customer success function a few years ago. And they have a really disciplined approach that says I can help, what's going on inside the customer, our level of engagement, we have telemetry now in terms of understanding what's going on for the environment, how we're engaging partners and save that organization. *So we really do have a great 360-degree view of the customer and what's happening. And so we do see 2024 as being an outlier to our renewal rates, and we anticipate that to improve into 2025, and we've got a handle on all of the levers to do that*.

118.  The Individual Defendants and the other Teradata executives were actively tracking and intimately involved in the sales process for their large clients, including having a detailed understanding of their customers' needs and the risks of closing those deals.  The Individual Defendants were aware of the sales elongation that was occurring and the corresponding risk to the Company that made Defendants' statement misleading; or if the Company's CEO and CFO were unaware, this ignorance constitutes acting in such a deliberately reckless manner as to constitute a fraud and deceit upon Plaintiff and other Class members.

**B.     The Entire Future Success Of The Company Rested On The Successful Transition From On-Prem To Cloud Services**

119.    In September 2021, Teradata shifted its focus to become a cloud-first company. McMillan, speaking at an investor conference on September 9, 2021, told investors "Teradata is a new company." McMillan emphasized that he believed that he, as CEO, "had to pivot the company to be modern and relevant in the cloud, the highest growth segment of the market."

120.    McMillan expected the "market around data" to rise from $85 billion, with $57 billion on-prem, in 2021 to $150 billion with more than $90 billion of cloud revenue in 2025.  Teradata, he claimed, was "a player in a large and rapidly growing data market with unmatched technology, a robust and sticky enterprise customer base."

121.    Defendants, from the very start, emphasized that the transition to a cloud-first business would lead to an increase in cloud ARR from $100 million in 2021 to $1 billion in 2025. This would allow for an operating profit margin in the low 20% range and free cash flow of approximately $550 million, of which at least 50% of excess capital would be returned to shareholders in the form of stock repurchases.

122.    Defendants acknowledged this cloud-first transition constituted a "significant structural change" as Teradata changed its financial operating model from perpetual licenses to subscriptions. This change would lead to more recurring revenue and higher gross profit margins. Defendants emphasized that Cloud ARR growth was "clearly a primary focus" and cloud data migration for existing on-prem customers was "derisked" by staying with Teradata instead of transitioning to competitors. Cloud ARR was expected to make up more than 50% of Teradata's Total ARR by 2025.

123.    As such, the Individual Defendants were aware of the sales of its primary services to large customers and the status of contracts, particularly ones that had been cancelled by large customers of its vital legacy business; or if the Company's CEO

1 and CFO were unaware, this ignorance constitutes acting in such a deliberately

2 reckless manner as to constitute a fraud and deceit upon Plaintiff and other Class

3 members. However, the most reasonable inference is that the Individual Defendants

4 were aware of these facts.

5 **IX.    UNDISCLOSED ADVERSE FACTS**

6 124.  The market for Teradata's securities was open, well-developed and

7 efficient at all relevant times.  As a result of these materially false and/or misleading

8 statements, and/or failures to disclose, Teradata's securities traded at artificially

9 inflated prices during the Class Period.  Plaintiff and other members of the Class

10 purchased or otherwise acquired Teradata's securities relying upon the integrity of the

11 market price of the Company's securities and market information relating to Teradata,

12 and have been damaged thereby.

13 125.  During the Class Period, Defendants materially misled the investing

14 public, thereby inflating the price of Teradata's securities, by publicly issuing false

15 and/or misleading statements and/or omitting to disclose material facts necessary to

16 make Defendants' statements, as set forth herein, not false and/or misleading.  The

17 statements and omissions were materially false and/or misleading because they failed

18 to disclose material adverse information and/or misrepresented the truth about

19 Teradata's business, operations, and prospects as alleged herein.

20 126.  At all relevant times, the material misrepresentations and omissions

21 particularized in this Complaint directly or proximately caused or were a substantial

22 contributing cause of the damages sustained by Plaintiff and other members of the

23 Class.  As described herein, during the Class Period, Defendants made or caused to

24 be made a series of materially false and/or misleading statements about Teradata's

25 financial well-being and prospects.  These material misstatements and/or omissions

26 had the cause and effect of creating in the market an unrealistically positive

27 assessment of the Company and its financial well-being and prospects, thus causing

28 the Company's securities to be overvalued and artificially inflated at all relevant

times.  Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's securities at artificially inflated prices, thus causing the damages complained of herein when the truth was revealed.

## X.    APPLICABILITY OF PRESUMPTION OF RELIANCE (FRAUD-ON-THE-MARKET DOCTRINE)

127.  The market for Teradata's securities was open, well-developed and efficient at all relevant times.  As a result of the materially false and/or misleading statements and/or failures to disclose, Teradata's securities traded at artificially inflated prices during the Class Period.  On August 1, 2023, the Company's share price closed at a Class Period high of $57.41 per share.  Plaintiff and other members of the Class purchased or otherwise acquired the Company's securities relying upon the integrity of the market price of Teradata's securities and market information relating to Teradata, and have been damaged thereby.

128.   During the Class Period, the artificial inflation of Teradata's shares was caused by the material misrepresentations and/or omissions particularized in this Complaint causing the damages sustained by Plaintiff and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about Teradata's business, prospects, and operations.  These material misstatements and/or omissions created an unrealistically positive assessment of Teradata and its business, operations, and prospects, thus causing the price of the Company's securities to be artificially inflated at all relevant times, and when disclosed, negatively affected the value of the Company shares.  Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's securities at such artificially inflated prices, and each of them has been damaged as a result.

129.   At all relevant times, the market for Teradata's securities was an efficient market for the following reasons, among others:

(a)     Teradata shares met the requirements for listing, and was listed and actively traded on the New York Stock Exchange, a highly efficient and automated market;

(b)     As a regulated issuer, Teradata filed periodic public reports with the SEC and/or the New York Stock Exchange;

(c)     Teradata regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and/or

(d)     Teradata was followed by securities analysts employed by brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

130.   As a result of the foregoing, the market for Teradata's securities promptly digested current information regarding Teradata from all publicly available sources and reflected such information in Teradata's share price. Under these circumstances, all purchasers of Teradata's securities during the Class Period suffered similar injury through their purchase of Teradata's securities at artificially inflated prices and a presumption of reliance applies.

131.   A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class's claims are, in large part, grounded on Defendants' material misstatements and/or omissions.  Because this action involves Defendants' failure to disclose material adverse information regarding the Company's business operations and financial prospects—information that Defendants were

obligated to disclose—positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions. Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

## XI.   NO SAFE HARBOR

132.   The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of Teradata who knew that the statement was false when made.

## XII.   CLAIMS

### FIRST CLAIM

### Violation of Section 10(b) of The Exchange Act and

### Rule 10b-5 Promulgated Thereunder

### Against All Defendants

133.   Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

134.   During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (ii) cause Plaintiff and other members of the Class to purchase Teradata's securities at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each defendant, took the actions set forth herein.

135.   Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Teradata's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5. All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

136.   Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about Teradata, as specified herein.

137.   Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices,

and a course of conduct as alleged herein in an effort to assure investors of Teradata's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Teradata and its business operations and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities during the Class Period.

138. Each of the Individual Defendants' primary liability and controlling person liability arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these defendants, by virtue of their responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of, and had access to, other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these defendants was aware of the Company's dissemination of information to the investing public which they knew and/or recklessly disregarded was materially false and misleading.

139. Defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of

1  concealing Teradata's financial well-being and prospects from the investing public
2  and supporting the artificially inflated price of its securities. As demonstrated by
3  Defendants' overstatements and/or misstatements of the Company's business,
4  operations, financial well-being, and prospects throughout the Class Period,
5  Defendants, if they did not have actual knowledge of the misrepresentations and/or
6  omissions alleged, were reckless in failing to obtain such knowledge by deliberately
7  refraining from taking those steps necessary to discover whether those statements
8  were false or misleading.

9  140.  As a result of the dissemination of the materially false and/or misleading
10 information and/or failure to disclose material facts, as set forth above, the market
11 price of Teradata's securities was artificially inflated during the Class Period.  In
12 ignorance of the fact that market prices of the Company's securities were artificially
13 inflated, and relying directly or indirectly on the false and misleading statements made
14 by Defendants, or upon the integrity of the market in which the securities trades,
15 and/or in the absence of material adverse information that was known to or recklessly
16 disregarded by Defendants, but not disclosed in public statements by Defendants
17 during the Class Period, Plaintiff and the other members of the Class acquired
18 Teradata's securities during the Class Period at artificially high prices and were
19 damaged thereby.

20 141.  At the time of said misrepresentations and/or omissions, Plaintiff and
21 other members of the Class were ignorant of their falsity and believed them to be true.
22 Had Plaintiff and the other members of the Class and the marketplace known the truth
23 regarding the problems that Teradata was experiencing, which were not disclosed by
24 Defendants, Plaintiff and other members of the Class would not have purchased or
25 otherwise acquired their Teradata securities, or, if they had acquired such securities
26 during the Class Period, they would not have done so at the artificially inflated prices
27 which they paid.

28

142.  By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

143.  As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

**SECOND CLAIM**

**Violation of Section 20(a) of The Exchange Act**

**Against the Individual Defendants**

144.  Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

145.  Individual Defendants acted as controlling persons of Teradata within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions and their ownership and contractual rights, participation in, and/or awareness of the Company's operations and intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading. Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

146.  In particular, Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

147.    As set forth above, Teradata and Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their position as controlling persons, Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## XIII.  PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

(a)    Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

(b)    Awarding compensatory damages in favor of Plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)    Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)    Such other and further relief as the Court may deem just and proper.

## XIV.  JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

1  DATED: December 6, 2024    **GLANCY PRONGAY & MURRAY LLP**

2

3                                 By:  _s/ Casey E. Sadler_
                                  Robert V. Prongay
4                                 Casey E. Sadler
                                  Pavithra Rajesh
5                                 1925 Century Park East, Suite 2100
                                  Los Angeles, CA 90067
6                                 Telephone: (310) 201-9150
                                  Facsimile: (310) 201-9160
7

8                                 **HOLZER & HOLZER, LLC**
                                  Corey D. Holzer
9                                 211 Perimeter Center Parkway, Suite 1010
                                  Atlanta, Georgia 30346
10                                Telephone: (770) 392-0090
                                  Facsimile: (770) 392-0029
11

12                                *Counsel for Lead Plaintiff Brian Jurko*

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## **<u>PROOF OF SERVICE</u>**

I hereby certify that on this 6th day of December, 2024, a true and correct copy of the foregoing document was served by CM/ECF to the parties registered to the Court's CM/ECF system.

<u>*s/ Casey E. Sadler*</u>
Casey E. Sadler